UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RICKEY L. DAVIS, | ) |
| SHERONDA  DAVIS next best friends of | ) |
| M.D., | ) |
| | ) |
| Plaintiffs, | ) |
| | )     No. 1:11-cv-00771-SEB-MJD |
| vs. | ) |
| | ) |
| CARMEL CLAY SCHOOLS, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON PENDING MOTIONS**

This cause is before the court on Plaintiffs' Motion for Sanctions Regarding

Spoliation of Evidence [Docket No. 125], filed on December 5, 2012, and Defendant's

Motion for Partial Summary Judgment [Docket No. 132], filed on December 7, 2012.

Plaintiffs, Rickey Davis and Sheronda Davis, Next Best Friends of M.D., bring this case

against Defendant Carmel Clay Schools ("the School"), pursuant to Title IX of the

Education Amendments Act of 1972 and 42 U.S.C. § 1983, alleging that M.D. was

subjected to unlawful peer-on-peer harassment that violated his substantive due process

and equal protection rights and that the School failed to properly train its officials in

recognizing and responding to sexual assault and harassment.[1]  For the reasons detailed

---

[1] Plaintiffs also allege various state law negligence claims.  However, the School has
moved for summary judgment only on Plaintiffs' claims brought pursuant to federal law.
Accordingly, we do not address the merits of Plaintiffs' state law claims further.

below, we <u>DENY</u> Plaintiffs' Motion for Sanctions and <u>GRANT</u> Defendant's Motion for Partial Summary Judgment.

## **Factual Background**

### I.     **Facts Related to Defendant's Summary Judgment Motion**

In the fall of 2009, M.D. was a freshman at Carmel High School ("CHS") and acted as the manager of the freshman boys' basketball team.  His grades prevented him from making the team in 2009, but the freshman basketball coach, Justin Blanding, agreed to help M.D. with his studies by overseeing his academic performance and assisting him with his assignments.  Despite not being officially a team member, M.D. was encouraged to spend time around the team, and thus Jacob Sutton, the student manager of the varsity basketball team, assigned M.D. a locker in the basketball locker room.  M.D. would change into his basketball clothes in the locker room before practices where he used his assigned locker to store his basketball clothes.

**Locker Room Harassment**

M.D. alleges that from November 2009 through January 2010, he was consistently harassed in the basketball locker room before and after practice by four senior basketball players: Robert Kitzinger, Scott Laskowski, Brandon Hoge, and Oscar Falodun.  These four seniors allegedly "flashed" M.D., taunted him with sexual innuendos, grabbed his genitals, and "gooched" him, a term used to describe anal penetration by another person's fingers, either over a layer of clothes or with skin-to-skin contact.  According to M.D.,

2

the "gooching" occurred on at least two or three occasions and the other harassment occurred almost daily during that time period.  Although he is not gay, M.D. believes the four seniors could have perceived him to be homosexual based on his habits and proclivities, but that he is "not necessarily sure." *Id.* at 30.

M.D. testified that the first "gooching" incident occurred after he told the basketball team that he had engaged in sexual intercourse with a girl in the varsity locker room shower.   According to M.D., the assault lasted approximately five minutes and involved his being dragged to the shower, the perpetrators making an attempt to force his pants down, and finally being successively "gooched" through his clothes by all four seniors.  M.D. screamed "stop," but no one came to his aid.  During the assault, M.D. told the perpetrators that what they were doing "was gay," and one of them replied, "it's not gay unless you cum."  M.D. Dep. at 96.  M.D. alleges that during the second "gooching," Falodun came up behind him in the locker room and Falodun put his fingers up M.D.'s buttocks, anally penetrating him, stating "it wasn't gay unless you cum." *Id.* at 104.  On another occasion, Falodun pushed M.D. up against the wall, put him over a trash can, and began simulating sex.  M.D. testified that because he was "gooched" both over and under his clothes he began to wear two pairs of gym shorts daily in an attempt to protect himself.

**The Bus Incident**

On Friday night, January 22, 2010, M.D. traveled on a school bus to Terre Haute, Indiana, with the freshman, junior varsity, and varsity basketball teams for a game against

3

Terre Haute South.  After a stop for dinner, seniors Laskowski, Hoge, and Kitzinger boarded the bus and proceeded to sit in the back.  M.D. sat near the front of the bus, approximately a row or two behind where the coaches were sitting.  From that location, M.D. could not hear what was going on in the back of the bus.  At some point, however, M.D. alleges that he heard the three seniors calling his name, and, because he was afraid of what would happen if he did not see what they wanted, he went to the back of the bus. The three seniors then grabbed M.D., pulling him into one of the seats, and one of them sat on his face.  The perpetrators tried to remove his shoes and socks and pull down his pants.  They succeeded at pulling down one pair of shorts, but M.D. was wearing two pairs.  Hoge then stuck his fingers into M.D.'s lower buttocks over the shorts.  M.D. was then pulled to the ground at which point he alleges he was anally penetrated.  M.D. contends that he tried to return to the front of the bus but that other freshmen players were blocking him with their legs.  According to M.D., when he tried to call out for help, the three seniors covered his mouth while the other players simply watched.  When M.D. was finally released by the seniors, he returned to the front of the bus.  The three boys' basketball coaches, including Coach Blanding, were sitting in the front of the bus throughout the assault.  Coach Blanding testified that he did not hear or see anything during the bus ride that alerted him to any occurrence of physical or sexual abuse or any other form of hazing.

**Disclosure of the Incidents of Harassment and Sexual Assault**

At some point in February 2010 – after the bus incident occurred but before School officials were informed of the incident – M.D. alleges that he was in Coach Blanding's office with some of the other players, including Falodun.  In Coach Blanding's presence, Falodun asked M.D. if he (M.D.) needed "Lubriderm."  Coach Blanding allegedly questioned M.D. about the comment and M.D. told Blanding that he had been sexually assaulted on the school bus on the way home from Terre Haute, and also that he had been harassed on numerous occasions in the boys' locker room.[2]  M.D. contends that Coach Blanding asked why he did not say anything earlier, and M.D. replied that he thought Blanding already knew.  Plaintiffs allege that Coach Blanding apparently took no action in response to M.D.'s report of harassment.  Coach Blanding denies that this conversation ever took place, contending that he had no knowledge either of the incident on the bus or the prior harassment until February 16, 2010, the date on which School officials were first notified.

Junior varsity boys' basketball coach Chris Vandenberg also denies that he was made aware by M.D. or any other student of "hazing or bullying or fighting or inappropriate sexual contact."  Vandenberg Dep. at 30.  Coach Vandenburg testified that,

---

[2] Plaintiffs allege this conversation occurred on February 8, 2010.  However, the School contends that it is unclear the exact date on which the conversation occurred because M.D. provided no date for the conversation in his deposition and the Notice of Tort Claim states only that the conversation occurred during the week of February 8, 2010.  Coach Blanding denies that the conversation with M.D. took place at all and claims that he had no knowledge of M.D.'s assault allegations or of the incident on the bus before February 16, 2010, the date on which the School's administrators first learned of the allegations.  Blanding Aff. ¶ 12.

prior to the Terre Haute bus trip, he had heard of an issue between Kitzinger and another player (not M.D.).  According to Coach Vandenberg, he asked the student what happened and the student responded that he and Kitzinger "got into some kind of … altercation I guess you would call it."  *Id.* at 40.  Coach Vandenberg testified that he asked the student further about the incident, but the student assured him that "it was no problem."  *Id.* Based on the student's assurances, Coach Vandenberg did not report this conversation or take any further action.[3]

M.D. testified that he had "tried" to tell his physical education teacher, Lisa Ruxer, and the acting assistant principal for discipline, Kevin Gallman, about the harassment to which he had been subjected in the boys' locker room, but that ultimately he did not disclose to them what had occurred.  According to M.D.'s testimony, "The entire team was aware, but none of the teachers knew about it."  M.D. Dep. at 91.  Eventually, the School learned of the harassment as well as the Terre Haute bus incident not from M.D., but from the mother of another student.  On February 16, 2010, around 11:00 a.m., a nurse at the School received a telephone call in which a parent alleged that on January 22, 2010, M.D. was sexually assaulted on the school bus while returning from the Terre Haute South basketball game.  School administrators were immediately informed of the report and began investigating the allegations.  Superintendent Jeffrey Swensson testified

---

[3] Plaintiffs allege that School officials did in fact have knowledge prior to February 2010 that incidents of hazing and harassment perpetrated by members of the boys' basketball team had occurred, both to M.D. and other students.  However, Plaintiffs rely on unsworn statements and/or inadmissible hearsay to support this contention, which do not satisfy the requirements of Federal Rule of Civil Procedure 56(e) that summary judgment materials "be made upon personal knowledge, [and] shall set forth such facts as would be admissible in evidence …."

that he learned of the incident from CHS principal John Williams during a break in a meeting on February 16, 2010, that had begun at 9:00 a.m.  However, it is unclear from the record the exact time of their conversation.  Once notified, School officials informed their resource officer, Phil Hobson, of the report and also notified the Carmel Police Department who began an investigation by questioning students.  The investigation was ongoing through March 2010.  On the same day that M.D. first made his allegations public about the three seniors involved in the Terre Haute bus incident, those three students each received out-of-school suspensions for five days and were ultimately expelled.

**M.D.'s Disciplinary and Academic Record**

During his seven semesters as a student in the Carmel Clay School system, M.D. had accumulated forty-eight separate disciplinary referrals.  From November 2009 through January 2010, the time period during which the harassment is alleged to have occurred, M.D. had a total of five disciplinary referrals, four for attendance related issues and one for a "failure to comply."  Dillon Aff. Exh. A.  Prior to November 2009, M.D. was disciplined for offenses such as disruptive behavior, harassment and threats, theft, fighting, and providing false information.  *Id.*  In his only full semester at CHS, which ended in December 2009, M.D.'s letter grades included a B+, a B, two Cs, a D, a D-, and two Fs, which resulted in a grade point average of 1.26.  *Id.*  The year before, as an eighth grader, M.D. had earned all Fs in his first quarter; three Fs, a D-, and a C+ in his second quarter; all Fs in the third quarter; and an A, a D, a D-, and two Fs in his final quarter.  *Id.*

M.D.'s parents testified that they first noticed around the time basketball season started in 2009 that M.D. had become quiet, easily irritated, and disrespectful to them. They had no knowledge of any of the incidents of harassment M.D. had experienced until the issue was brought to light by another school parent on February 16, 2010. According to Plaintiffs, after being informed by CHS administrators that the students involved in the harassment would be re-enrolled three days later, M.D.'s father decided to withdraw M.D. from CHS.

On March 8, 2010, M.D. transferred out of the Carmel Clay School District and enrolled at Charles A. Tindley Accelerated High School ("Tindley") in Indianapolis, Indiana. According to M.D.'s mother, because of M.D.'s low grades and his questionable status at CHS, Tindley was the only school that would admit him. Tindley is an accelerated school, which means that tenth grade class work is done in ninth grade. Upon entrance, after taking a placement examination, M.D. was held back one grade level, and thus was enrolled as an eighth grader. While he attended Tindley, M.D. struggled both with his academics as well as controlling his verbal outbursts toward teachers. M.D. attended Tindley for approximately four or five months, including participating in the school's summer sessions to try to complete his freshman year of studies. Despite these efforts, M.D. was still considered a second-year freshman for the 2010-2011 school year.

Before school began, Tindley's Dean of Students decided that to hold M.D. back another year would be a harsh punishment. Instead he recommended M.D.'s transfer to

Herron High School where he would enroll as a freshman.  In August 2010, M.D. transferred to Herron High School in downtown Indianapolis.  Because of his low grade point average, Herron was the only high school that would accept M.D.'s transfer at that time.  In the fall of 2012, M.D. again transferred schools, this time to Horizon Christian, in order to be closer to his residence in Carmel, Indiana.  According to M.D., these transfers have caused him emotional, psychological, and social inconsistencies that have made it difficult for him to trust people and to have normal social interactions and friendships.  M.D. is currently undergoing counseling to deal with these difficulties.

## II.    Facts Related to Plaintiff's Motion for Sanctions

The bus utilized by the School on January 22, 2010 to transport the boys' basketball teams to the game against Terre Haute South had video cameras installed both at the front and in the middle of the passenger areas, which recorded video footage whenever the bus was in use.  During the time period relevant to the events at issue in this litigation, the School did not maintain records identifying the individuals who requested that the hard drives located on the buses be removed nor did it keep logs of who handled and/or viewed the hard drives once they were removed.  However, according to Rollin Farrand, the Director of Transportation and Facilities of the School, the school bus computer hard drives were removed only upon the request of an administrator, and such requests generally would be made in response to specific precipitating events, such as a complaint or other incident.  Video footage from a particular bus upon request would be uploaded to the School's servers and the requesting

administrator would be informed that the video was available to be reviewed.  After a requested video was uploaded, the removed hard drive was stored unlocked in the Transportation Building, essentially serving as a "spare" hard drive until it was needed in another bus.

The school bus on which M.D.'s alleged assault occurred was identified by School officials as Bus #50.  It is undisputed that, on February 10, 2010, the hard drive from the camera installed near the middle of Bus #50 was removed.  As previously noted, because the School did not keep records at that time, the identity of the administrator who made the request along with an indication of the reason for the request on that date is unknown.[4]  There is also no record of which portions of the video footage were uploaded to the School's server after that hard drive was removed from Bus #50 or whether the entire hard drive was uploaded.  Based upon the disc size of the hard drive, approximately twenty school days of video footage could be stored before overwriting of data would have been necessary.  Thus, for example, when the hard drive was removed from Bus #50 on February 10, 2012, it would have contained video files dating back to January 13, 2010.  Accordingly, the footage from the January 22, 2013 assault would have been intact on the hard drive at that point.

---

[4] Plaintiffs' position is that the hard drive was removed in response to M.D.'s report to Coach Blanding (which Plaintiffs contend occurred on February 8, 2010) about the locker room harassment and assault on the bus.  The School contends that the hard drive had to have been removed on February 10, 2010 for a reason other than to investigate M.D.'s allegations because it maintains that no School officials were aware of his allegations until February 16, 2010.

After learning on February 16, 2010 of the allegations surrounding the incident that occurred on Bus #50, school officials requested that the hard drive from the bus be pulled for viewing.  As noted above, Bus #50's hard drive from the camera installed in the middle of the bus had already been removed for viewing on February 10th for an undetermined reason.  According to Plaintiffs' computer expert, Rebecca Hendricks, the hard drive was re-accessed on February 22, 2010, at 8:04 a.m., and, according to Plaintiffs, was reinserted into a different bus (Bus #29) that same day by an unknown employee of the School.[5]  As a result of the manner in which the computer system functioned, once the hard drive from Bus #50 was inserted in Bus #29, all of the video files then stored on the hard drive would be automatically deleted, and, as new video was recorded, the individual deleted files began to be overwritten.

Also on February 22, 2010, the School's Resource Officer, Sergeant Phil Hobson, Principal John Williams, Athletic Director John Inskeep, Detective Greg Dawson, and Evidence Technician Scott Pilkinton met in an effort to coordinate the Carmel Police Department's investigation with the administrative investigation of the reported incidents. The next day, on February 23, 2010, the Carmel City Attorney issued a statement to the media noting that a "video may not even exist."  Exh. 13.  Two days later, on February 25, 2010, the hard drive that had originally been installed in Bus #50 was removed from Bus #29 by Mr. Farrand and his employee, and was stored in an unlocked cabinet in Mr.

---

[5] According to the Mr. Farrand's testimony, only he, the garage staff, and the mechanics had access to the cylindrical keys that were needed to remove and/or insert a hard drive into a bus.  Administrators at the School could ask any of the individuals with cylindrical keys to remove or insert a bus hard drive.  Throughout the time period relevant to this litigation, no records of such requests were kept.

Farrand's office in the Transportation Department until March 3, 2010, when it was turned over upon request to the Fishers Police Department.

The entirety of the video footage from the camera that was installed at the front of Bus #50 was recoverable. However, the Fishers Police Department was unable to recover the entirety of the video footage that would have, arguably, depicted the January 22, 2010 assault from the hard drive of the camera located near the middle of Bus #50. Plaintiffs' expert, Ms. Hendricks, also accessed the hard drive in an attempt to recover the overwritten files, but was able to recover only thirty-four out of forty deleted files. One of the six segments of video footage that was completely unrecoverable was the segment that would have captured the seven minute sexual assault. Ms. Hendricks's expert report explains that deleted files can be recovered. However, when a file is deleted and then subsequently overwritten by virtue of a new file being recorded over it, it cannot be recovered. Docket No. 151-6 (Pls.' Expert Report) at 28.

## III.    The Instant Litigation

On June 7, 2011, Plaintiffs filed their complaint against Carmel Clay Schools, alleging federal claims brought pursuant to Title IX and 42 U.S.C. § 1983 as well as several state law claims. Plaintiffs filed their Motion for Sanctions on December 5, 2012, alleging that the School intentionally deleted the video footage from Bus #50's hard drive, and, on December 7, 2012, Defendant filed its Motion for Partial Summary Judgment, seeking to have Plaintiffs' federal claims dismissed. We now address these fully briefed motions.

## Legal Analysis

### I.        Plaintiffs' Motion for Sanctions

Under Indiana law, "spoliation" refers to "[t]he intentional destruction, mutilation, alteration, or concealment of evidence, usually a document." *Cahoon v. Cummings*, 734 N.E.2d 535, 545 (Ind. 2000) (quoting BLACK'S LAW DICTIONARY 1409 (7th ed. 1999)). The prevailing rule in the Seventh Circuit "is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction." *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001) (quotation marks and citation omitted). "The crucial element is not that the evidence was destroyed but rather the reason for the destruction." *S.C. Johnson & Son, Inc. v. Louisville & Nashville R. Co.*, 695 F.2d 253, 258 (7th Cir. 1982). In order to show "bad faith," it must be established that the evidence was intentionally destroyed "for the purpose of hiding adverse information." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998). "'Bad faith' is a question of fact like any other, so the trier of fact is entitled to draw any reasonable inference." *Id.*

Here, Plaintiffs argue that spoliation of evidence occurred when Bus #50's hard drive was put into Bus #29 on February 22, 2010 and the video files were deleted and particular files were subsequently overwritten. It is clear that the act of reinserting the Bus #50 hard drive into Bus #29 was an intentional act. But there is no evidence based on the facts currently before us to support a conclusion that that act was undertaken in

13

order to destroy adverse evidence as opposed to its being mere negligence in the handling of the hard drive.  Plaintiffs continually argue that Ms. Hendricks's report establishes that the unrecoverable video files had to have been "first intentionally deleted prior to being overwritten when placed into Bus #29" in order to have been unrecoverable, but that is not what Ms. Hendricks's report states.  Instead, her report provides that deleted files (apparently whether deleted intentionally or as a function of the system) can be recovered.  It is only when the deleted files are overwritten by new files that recovery becomes impossible.  Plaintiffs also attribute to Ms. Hendricks the opinion that the overwritten files had to have been "manually deleted" before being overwritten in order to have been unrecoverable, but again no such conclusion appears in Ms. Hendricks's 46-page report.

Accordingly, there is no evidence in the current record to support the conclusion that any employee of the School manually deleted the video files from the time period during which the sexual assault occurred before reinserting the hard drive in Bus #29, all in an effort to destroy evidence.  Instead, the facts before us only establish that the video files were apparently in an undeleted state when the hard drive was reinserted onto Bus #29, at which point the files were all immediately and automatically deleted as a function of the computer system itself.  It was only once the files began to be overwritten by new video files that the material became unrecoverable.  Although there is nothing in the record to explain why only those particular six segments of video (including one segment taken during the sexual assault) were overwritten, there is certainly no allegation or

evidence to show that it was possible for a School official to have specifically identified and selected particular files to be overwritten, much less that that is what actually occurred.

For these reasons, we find no basis for drawing a reasonable inference of bad faith on the facts before us.  If additional evidence regarding the School's actions relating to its handling of Bus #50's hard drive comes to light, we will revisit this issue, but at this point, Plaintiffs have failed to establish any entitlement to sanctions based on a theory of evidence spoliation.[6]

## II.    Partial Motion for Summary Judgment

### A.  Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See *id.* at 255.

---

[6] We note that, even if Plaintiffs could prove that evidence spoliation had occurred, at best that showing would only permit an adverse jury inference that the missing evidence is unfavorable to the party who intentionally destroyed it.  Such an inference does not lessen or relieve Plaintiffs' burden to prove their case.  *See Flaherty & Collins, Inc. v. BBR-Vision I, L.P.*, 990 N.E.2d 958, 970-71 (Ind. Ct. App. 2013) (citations omitted).

However, neither the "mere existence of some alleged factual dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one

essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes*, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

### B.  Title IX Peer Harassment

"A school district may incur Title IX liability for student-on-student sexual harassment if the district was deliberately indifferent to harassment that was so pervasive, severe, and objectively offensive that it denied the student equal access to education." *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 649 (1999); *Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 821 (7th Cir. 2003)).  A school is liable for peer-on-peer harassment only when the school has actual knowledge of the harassing conduct and its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.

Here, the School contends that Plaintiffs have failed to establish a claim pursuant to Title IX because they have failed to show that the harassment suffered by M.D. was on the basis of his sex; that the harassment deprived M.D. of educational opportunities; that

the School had actual knowledge of the harassment; and that the School was deliberately indifferent to the harassment. We address these arguments in turn below.

### 1. Harassment Based on Sex

Title IX prevents discrimination on the basis of sex. Thus, "in order to be actionable, the offensive behavior must be based on sex, rather than personal animus or other reasons." *Benjamin v. Lawrence Tp. Metro. Sch. Dist.*, No. IP 00-0891-C-T/K, 2002 WL 977661, at *3 (S.D. Ind. Mar. 27, 2002) (citing *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (11th Cir. 2002)). The fact that, here, the victim and the harassers are of the same sex does not necessarily preclude a Title IX claim. The Supreme Court has held that same-sex harassment can constitute sex discrimination if the harassment is (1) motivated by sexual desire; (2) motivated by hostility towards a specific gender; or (3) demonstrates differential treatment of males and females. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (Title VII).[7]

These categories are not necessarily exhaustive in describing the ways in which a plaintiff can establish prohibited same-sex harassment, however. Indeed, "there is no singular means of establishing the discriminatory aspect of sexual harassment. So long as the plaintiff demonstrates in some manner that he would not have been treated in the same way had he been a woman, he has proven sex discrimination." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999) (Title VII). "Whatever evidentiary route

---

[7] *Oncale* was a Title VII case, but federal courts recognize that Title VII cases inform the analysis of sex discrimination claims under Title IX. *E.g.*, *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 953 (S.D. Ind. 2007) (citation omitted).

the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted *discrimination* because of sex." *Oncale*, 523 U.S. at 81 (internal quotation marks and alterations omitted) (emphasis in original).

Here, Plaintiffs argue that M.D. was being harassed because of a perceived failure to adhere to traditional male stereotypes. Under Seventh Circuit law, "[i]f an individual is being harassed because of a failure to adhere to specific sexual stereotypes, and not because of his sexual orientation, he has an actionable claim." *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 953 (S.D. Ind. 2007) (citing *Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d 1058, 1065 n.5 (7th Cir. 2003)). The Seventh Circuit has held that such "gender stereotyping" is actionable under Title IX because it relies "upon stereotypical notions about how men and women should appear and behave…." *Doe v. City of Belleville, Ill.*, 119 F.3d 563, 581 (7th Cir. 1997), *vacated on other grounds by* 523 U.S. 1001 (1998) (mem.).

Plaintiffs contend that there are sufficient facts in the record at least to raise a genuine issue of material fact regarding whether M.D.'s harassment was based on the perpetrators' belief that he was acting in a manner that did not conform to traditional male stereotypes. In support of this contention, Plaintiffs emphasize that M.D. was not on the basketball team and that he was a weaker, smaller male than his attackers, weighing less than 165 pounds and standing less than 5'10" tall at the time of the harassment. M.D. also had an "artistic" side that Plaintiffs contend could be perceived as

non-masculine; specifically, M.D. enjoyed hobbies such as writing poetry and creating music without lyrics.  Plaintiffs contend that M.D. was inexperienced with girls and that he was harassed for his lack of experience.  Finally, Plaintiffs argue that the nature of the sexual assaults to which M.D. was subjected, coupled with the alleged perpetrators' taunt that, "it's not gay unless you cum," amounts to male stereotyping.

The School rejoins that the evidence designated by Plaintiffs does not establish that the senior student perpetrators targeted M.D. because on his sex or because they believed that he did not adhere to traditional male stereotypes.  The School highlights the fact that there is no indication in the record that any of the perpetrators knew of M.D.'s interest in the arts or that they ever taunted or harassed M.D. based on a belief that he was somehow less of a man or not masculine because he was smaller statured or enjoyed artistic pursuits.  We agree that there is no such evidence in the record, and, that the statement "it's not gay unless you cum," while crude, does not necessarily indicate that the harassment was based on M.D.'s sex or failure to adhere to gender stereotypes.

However, even if Plaintiffs failed to produce sufficient evidence that the harassment of M.D. was based on gender stereotyping, that does not necessarily doom their Title IX claim.  Given that the allegations in this case involve at least two physical sexual assaults with anal penetration and another incident in which one of the seniors put M.D. over a trash can and simulated sex, we find the evidence sufficient to raise, at the very least, a genuine issue of material fact regarding whether the harassment in this case was "based on sex."  *See, e.g.*, *Shepherd*, 168 F.3d at 1011 (genuine issue of material fact

regarding whether harassment based on sex when male harasser exposed his penis multiple times a week to male plaintiff, repeated instances in which harasser "grabbed himself" and one instance in which harasser "rubbed himself" into an erection while he threatened to sexually assault plaintiff).

### 2.   Denial of Educational Opportunities

In order to prevail on a Title IX claim, a plaintiff must establish that "the behavior at issue denies a victim equal access to education." *Gabrielle M.*, 315 F.3d at 823 (citing *Davis*, 526 U.S. at 652).  The harassment alleged must have a "concrete, negative effect" on the plaintiff's education. *Davis*, 526 U.S. at 654.  Here, we find that Plaintiffs have failed to establish that M.D. was deprived of educational benefits while the harassment was ongoing.  Although Plaintiffs allege that M.D. became more withdrawn once the basketball season began and the harassment started, the evidence does not show that M.D.'s disciplinary record, attendance, or grades declined in any significant way once M.D. began being harassed nor is there any indication that he was denied access to any educational opportunities during the period of harassment.

Plaintiffs also submit that M.D. was forced to transfer schools after the harassment and sexual assaults were made public because of a fear of ridicule and a feeling of insecurity with the School and its personnel.  According to Plaintiffs, because of M.D.'s low grade point average and the circumstances surrounding his departure from CHS, the only schools that would admit him required a significant commute from his home (approximately two hours round trip), necessitated his being held back a grade, and/or

21

failed to provide an acceptable level of college preparatory classes; thus, following his transfer from CHS, M.D. had to transfer schools two additional times before finding a suitable replacement.  Plaintiffs maintain that as a result of these transfers M.D. has experienced and continues to suffer from emotional, psychological, and social inconsistencies as well as a physical exclusion from his education, which they contend is the quintessential example of a deprivation of an educational opportunity under Title IX. *See Davis*, 526 U.S. at 650 (holding that "the overt, physical deprivation of access to school resources" constitutes denial of an educational benefit).

The School rejoins that Plaintiffs can point to no denial of educational opportunities while the harassment was ongoing and argues that Plaintiffs' voluntary decision to immediately withdraw M.D. from CHS after the allegations came to light and before it was even clear what, if any, repercussions would follow is not the type of physical exclusion contemplated in the case law.  *Cf. Hawkins v. Sarasota County Sch. Bd.*, 322 F.3d 1279, 1288-89 (11th Cir. 2003) (listing example of "circumstances where male students physically threatened female students daily, thereby successfully preventing them from using a computer lab or athletic field").  The School argues that, although Plaintiffs believe that M.D. would have suffered negative consequences if he had remained a student at CHS, there is no way to know what actually would have happened because Plaintiffs immediately withdrew him from CCS.

It is true, as the School argues, that it is impossible to know how M.D. would have been treated had he remained enrolled at CHS after the harassment and sexual assaults

were made public.  However, several courts have found withdrawal from school to

constitute "a concrete and negative effect" on the victim's education under Title IX.  *See,*

*e.g.*, *Seiwert*, 497 F. Supp. 2d at 953; *Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp.

2d 438, 445 (D. Conn. 2006).  Given the severity of the harassment and the physical

assaults that occurred here (which, for purposes of this motion at least, the School does

not dispute) as well as the level of publicity the allegations received because of the

perpetrators' status as varsity basketball players, there is at least a genuine issue of

material fact regarding whether the conduct and the resulting fallout may have been so

severe as to prevent M.D. from being able to continue to attend CHS.

### 3.   Actual Knowledge and Deliberate Indifference

Despite Plaintiffs' success in establishing that M.D. was subjected to sexual

harassment so severe, pervasive, and objectively offensive to have denied him equal

access to education, they have demonstrably failed to show that the School had

knowledge of the harassment or that, once it learned of the allegations, its response was

clearly unreasonable.  "To display deliberate indifference, the school district must first

have 'actual knowledge' of the sexual harassment."  *Doe-2 v. McLean County Unit Dist.*

*No. 5 Bd. of Directors*, 593 F.3d 507, 512 (7th Cir. 2010) (citation omitted).  Plaintiffs

argue that the School had the requisite knowledge of the harassment as early as October

or November 2009 because CCS's policies required the coaches to supervise the students,

and thus, "it would follow that the coaches knew that sexual assaults were occurring,

particularly if they had been properly supervising the students."  Pls.' Resp. at 21.  But

the case law is clear that "actual – not constructive – notice is the appropriate standard in peer-harassment cases." *Gabrielle M.*, 315 F.3d at 823 (citing *Davis*, 526 U.S. at 646-47). Plaintiffs also contend that the coaches and/or the School surely must have known about the sexual assaults because such conduct had been occurring in the boys' basketball program for several years and was "common knowledge" among both the students and the parents. However, as previously discussed, Plaintiffs cite only inadmissible hearsay and unsworn statements to support this conclusion, which we do not consider on summary judgment.

Viewing the admissible evidence in the light most favorable to Plaintiffs, as we are required to do at this stage of the litigation, the earliest date on which any member of the School's administrative, coaching or teaching personnel had actual notice of the harassment and sexual assaults was at some point during the week of February 8, 2010, when M.D. allegedly told Coach Blanding what had occurred on the school bus on the return trip from the Terre Haute South basketball game.[8]  Although Coach Blanding apparently took no action in response to these allegations, it is undisputed that M.D. did not suffer any further harassment at the hands of the perpetrators or any other basketball player following the conversation with Blanding.  Thus, there was no causal connection between Coach Blanding's apparent inaction and any of the incidents of harassment.

---

[8] Coach Vandenberg concedes that he had some knowledge of an undefined incident that occurred earlier between the perpetrators and another student, M.F., but he contends that M.F. assured him that it was not significant, and thus, he did not investigate further.  There is no indication that Coach Vandenberg was aware that the incident involved sexual harassment or an assault, and thus, the evidence before us clearly does not support a conclusion that actual knowledge can be attributed to the School based on this exchange.

The record before us unequivocally establishes that School administrators (not Coach Blanding) were first made aware of the sexual assault allegations at approximately 11:00 a.m. on February 16, 2010,[9] after receiving a telephone call from another student's parent reporting what had occurred on the Terre Haute bus trip. Once the School had actual knowledge of the allegations, its administrators acted quickly, almost immediately suspending the perpetrators and ultimately expelling them. Given the swiftness of the response and the seriousness with which the School treated the allegations, we cannot conclude that it acted in a clearly unreasonable manner once it had actual knowledge of the harassment. Accordingly, Plaintiffs' Title IX claim cannot survive summary judgment.[10]

---

[9] Plaintiffs claim that, despite the School's representations otherwise, administrators had to have been aware of the sexual assault that occurred on the athletic bus on the return trip from the Terre Haute South basketball game before the parent's telephone call on February 16, 2010 because CHS Superintendent Swensson testified that he learned of the allegations from CHS Principal Williams at a 9:00 a.m. meeting that day and the telephone call did not occur until about 11:00 a.m. However, Superintendent Swensson's testimony was not that he was told of the allegations *at* 9:00 a.m. but that he received notice *during a break in the meeting* that began at 9:00 a.m. He did not pinpoint the time at which the break occurred. Thus, nothing in Superintendent Swensson's testimony is inconsistent with the School's administrators having first received notice around 11:00 a.m.

[10] In their motion for sanctions, Plaintiffs argue that the missing video taken from the middle of the school bus could have shown actual knowledge and deliberate indifference on the part of the boys' basketball coaches with regard to the sexual assault that occurred the night of the Terre Haute South basketball game. However, this is nothing more than speculation as there is no indication in any of the testimony in the record, including the testimony of M.D. himself, that the coaches were made aware of the struggle in the back of the bus and ignored it or that any coach heard the struggle, came back to investigate, and failed to take appropriate action to stop the assault despite witnessing it in progress.

### C.  Section 1983 Claims

Plaintiffs have also brought claims under 42 U.S.C. § 1983,[11] alleging violations of the Equal Protection and Due Process clauses of the Fourteenth Amendment as well as a municipal liability claim against the School for a failure to train its employees.  We address each of these claims in turn below.

#### 1.  Equal Protection Claim

Plaintiffs argue that the School discriminated against M.D. because of his perceived sexual orientation, in violation of the Equal Protection Clause of the Fourteenth Amendment, which provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV § 1. Specifically, Plaintiffs allege that M.D. was harassed and assaulted because of his perceived homosexuality and that the School was deliberately indifferent to M.D.'s complaints regarding the harassment he received.

In order to establish an equal protection violation, M.D. must show that the School: (1) treated him differently from others who were similarly situated; (2) intentionally treated him differently because of his membership in the class to which he belonged (i.e., perceived homosexuals); and (3) because homosexuals (or perceived homosexuals) do not enjoy heightened protection under the Constitution, that the

---

[11] Section 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…."

discriminatory intent was not rationally related to a legitimate state interest. *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 950-51 (7th Cir. 2002) (citations omitted). For this claim to withstand summary judgment, Plaintiffs must establish that a genuine issue of material fact exists as to whether the School "acted either intentionally or with deliberate indifference" to his complaints of harassment because of his perceived homosexuality. *Id.* at 951 (citation omitted). If the School demonstrates that it did not deny M.D. equal protection on account of his perceived sexual orientation or if it had a "rational basis" for doing so, summary judgment is warranted. *Id.*

Even if we assume that a genuine issue of material fact exists regarding whether M.D. was harassed by the senior student perpetrators because they perceived him as homosexual, Plaintiffs cannot sustain their equal protection claim under § 1983 merely by showing that *students* were discriminating against him on that basis. Instead, Plaintiffs must establish that the *School* was deliberately indifferent to his complaints of harassment because of his perceived sexual orientation. *See id.* at 951-52. There simply is no evidence that the School perceived M.D. as homosexual, let alone that it treated M.D.'s complaints of harassment differently than complaints from students whom it did not perceive as homosexual. Accordingly, Plaintiffs' equal protection claim clearly cannot survive.

### 2. Due Process Claim

Plaintiffs next allege that the Due Process Clause of the Fourteenth Amendment imposed on the School a constitutional duty to protect M.D. Although private actors

generally have no constitutional duty to protect individuals from harm, such a duty is imposed on the state to protect individuals with whom it has a "special relationship" by virtue of the state's custody over the individual or in cases in which the state itself has created the danger. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198-201 (1989).

Plaintiffs allege that the state-created danger doctrine applies here. To establish a substantive due process claim under a state-created danger theory, Plaintiffs must establish that: (1) the School, by its affirmative acts, created or increased a danger that M.D. faced; (2) the School's failure to protect M.D. from danger was the proximate cause of his injuries; and (3) the School's failure to protect M.D. "shocks the conscience." *See Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011).

Plaintiffs argue that in early January 2010, Coach Vandenberg knew of a sexual assault against another member of the basketball team and failed to take appropriate action by reporting the incident, which Plaintiffs allege empowered the senior student perpetrators to continue harassing and assaulting M.D. However, as discussed above, Plaintiffs rely on inadmissible unsworn statements to support this argument regarding early notice. The admissible evidence in the record establishes that the earliest any School official had notice of M.D.'s sexual assault was at some point between February 8 and February 16, 2010, when M.D. allegedly told Coach Blanding about the "gooching" that occurred on the bus ride back from Terre Haute. Plaintiffs allege that Coach

Blanding's failure to report M.D.'s assault following this conversation put other students at risk for continued harassment.

There are several problems with Plaintiffs' argument. First, Plaintiffs are relying solely on the alleged inaction of the coaches to establish a state-created danger, but it is well-established under Seventh Circuit precedent that "[i]naction by the state in the face of a known danger is not enough to trigger the obligation…." *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993). Instead, "the so-called state-created danger exception provides that liability exists when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (internal quotation marks and citation omitted). Any alleged inaction on the part of the coaches simply does not satisfy this burden. Moreover, it is undisputed that M.D. was not subjected to any further incidences of harassment between the time of his alleged conversation with Coach Blanding and the report to the administration on February 16, 2010, at which point the senior student perpetrators were suspended from classes and ultimately expelled. Thus, even if Coach Blanding's failure to report the assault were an affirmative act, Plaintiffs cannot show that that failure was the proximate cause of M.D.'s injuries. Accordingly, Plaintiffs' due process claim based on a state-created danger theory does not survive summary judgment.

### 3.  Failure to Train

Plaintiffs allege that the School failed to properly train its officials and coaches to recognize and report incidents of sexual harassment or abuse and thus is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  However, "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."  *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) (citation omitted).  Because Plaintiffs have failed to establish an underlying constitutional violation on the part of any individual CHS employee, there can be no municipal liability under *Monell* for a failure to train.  *Id.*

Even if that were not the case, Plaintiffs' failure to train claim still would fail. "An allegation of a 'failure to train' is available only in limited circumstances." *Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993).  To prevail on such a claim, Plaintiffs must show that the School's "'failure to train its employees in a relevant respect evidences a deliberate indifference' to the rights of students."  *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).  In this context, deliberate indifference can arise when, "'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the deficiency exhibits deliberate indifference on the part of municipal policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (quoting *City of Canton*, 489 U.S. at 390).  Deliberate indifference can also be found "when a repeated pattern of

constitutional violations makes 'the need for further training … plainly obvious to the city policymakers.'"  487 F.3d at 492 (quoting 489 U.S. at 390, n.10).

Here, it is undisputed that CHS had policies in place concerning the reporting of child abuse.  Plaintiffs have offered no evidence to demonstrate that these policies were so obviously deficient as to alert the School's policymakers that its employees would likely violate the constitutional rights of its students.  Nor is there any indication that it was plainly obvious based on a repeated pattern of violations that the policy had already failed.  Plaintiffs again rely on inadmissible evidence to argue that sexual harassment was part of the "culture" of the basketball program and thus that it should have been obvious that the policy was deficient.  However, the admissible evidence in the record establishes that the first time any policymaker at the School learned of an alleged failure to adhere to the reporting policy was when it received notice in February 2010 of the allegations surrounding the sexual assault of M.D. that took place on the bus, at which point the School reported the allegations and then suspended and ultimately expelled the perpetrators.  Plaintiffs do cite to another incident in 1998 when a member of the swim team was sexually assaulted, but this second, isolated incident is insufficient to show a widespread practice of an unconstitutional nature.  *Cf. Grieveson v. Anderson*, 538 F.3d 763, 773-75 (7th Cir. 2008) (four instances of alleged unconstitutional conduct did not constitute widespread pattern or practice); *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (allegations of two instances of unconstitutional conduct did not demonstrate widespread practice).

31

## III.     State Law Claims

Having determined that all of Plaintiffs' federal claims must be dismissed, we turn to the question of whether we should exercise supplemental jurisdiction over the remaining claims in this case, all of which arise under Indiana law.  We have jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), which extends federal jurisdiction to all claims that are so related to a claim within the court's original jurisdiction that they form part of the same case or controversy within the meaning of Article III of the Constitution.

Federal courts can decline to exercise supplemental jurisdiction in certain circumstances, including when a court "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  The Seventh Circuit has identified the following three situations in which a court should retain jurisdiction over supplemental claims even though all federal claims have been dismissed: where the statute of limitations would bar the refiling of the supplemental claims in state court; where substantial federal judicial resources have already been expended on the resolution of the supplemental claims; and where it is obvious how the claims should be decided. *Williams Elec. Games, Inc. v. Garrity*, 479 F.3d 904, 906-07 (7th Cir. 2007) (citation omitted).

Neither party sets forth arguments in their briefing regarding this issue.  However, given the degree to which Plaintiffs' state law and federal claims are interrelated and that significant federal resources have already been expended on this case, we believe it

would be consistent with the principles of judicial economy, fairness, convenience, and comity for us to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.  *See City of Chicago v. International College of Surgeons*, 522 U.S. 156 (1997) (observing that, "when deciding whether to exercise supplemental jurisdiction, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity") (internal quotation marks and citation omitted).

## IV.  Conclusion

For the reasons detailed in this entry, Plaintiffs' Motion for Sanctions is <u>DENIED</u> and Defendant's Partial Motion for Summary Judgment is <u>GRANTED</u>.  The Court will exercise its supplemental jurisdiction over Plaintiffs' remaining claims brought under Indiana law.  The case will proceed accordingly.

IT IS SO ORDERED.

Date: _____ 09/30/2013 _____        _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Cari L. Sheehan
LEE FAIRMAN LLP
csheehan@nleelaw.com

Gregory P. Gadson
LEE FAIRMAN LLP
ggadson@nleelaw.com

Nathaniel  Lee
LEE FAIRMAN LLP
nlee@nleelaw.com

Robert B. Turner
LEE FAIRMAN LLP
rbtatty@aol.com

John W. Mervilde
MEILS THOMPSON DIETZ & BERISH
jmervilde@meilsattorney.com

Rick D. Meils
MEILS THOMPSON DIETZ & BERISH
rmeils@meilsattorney.com

Corinne T.W. Gilchrist
OFFICE OF THE INDIANA ATTORNEY GENERAL
corinne.gilchrist@atg.in.gov

Liberty L. Roberts
ROBERTS LEGAL GROUP, LLC
liberty@roberts-legal.com